Ashley M. McDow (245114)
Fahim Farivar (252153)
**FOLEY & LARDNER LLP**
555 S. Flower St., Suite 3300
Los Angeles, CA 90071
Telephone: 213.972.4500
Facsimile: 213.486.0065
Email: amcdow@foley.com
ffarivar@foley.com

[Proposed] Attorneys for Debtor and Debtor in Possession, PHILMAR CARE, LLC

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**RIVERSIDE DIVISION**

In re:

PHILMAR CARE, LLC,

Debtor and Debtor in Possession

Case No.: 6:18-bk-20286-WJ

Chapter 11

**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL ON AN INTERIM BASIS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF PHILIP WEINBERGER IN SUPPORT THEREOF**

DATE: January 2, 2019
TIME: 9:00 a.m.
PLACE: Courtroom 304
3420 12th Street
Riverside, CA 92501

The debtor and debtor in possession (the "Debtor") in the above-captioned bankruptcy case (the "Bankruptcy Case") hereby respectfully submits the within motion (the "Motion"), pursuant to sections 105, 361, and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the Central District of California (the "Local Rules") seeking entry

of an order approving the use of cash collateral, if any, on an interim basis on the terms set forth herein. In support thereof, the Debtor respectfully submits the following:

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. BASIS FOR EMERGENCY RELIEF

1. The Debtors move for entry of an interim order on an emergency basis pursuant to rule 9075-1 of the Local Rules. The Debtor is the licensed operator of a 204-bed skilled nursing facility commonly known as the "San Fernando Post Acute Hospital" (the "Facility"). Foothill Legacy, LLC ("Foothill") and the Internal Revenue Service (the "IRS") assert a security interest in most, if not all, of the Debtor's assets, including, without limitation, inventory, equipment, accounts receivables (including healthcare-insurance receivables), fixtures and general intangibles (collectively, the "Collateral"). The Debtors require the use of cash collateral in order to pay the costs and expenses associated with the operation of the facility, which the Debtors must pay in short order in order to avoid serious and irreparable injury to the business and the envisioned reorganization. Pursuant to section 363(c)(2) of the Bankruptcy Code, the IRS has consented to the Debtor's (further) use of cash collateral beginning January 4, 2019 up to and through January 15, 2019 (the "Interim Period") on certain terms and conditions to be memorialized in a stipulation to be filed with the Court in short order.

### II. STATEMENT OF FACTS

1. On or about December 7, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), which commenced the above-captioned case (the "Bankruptcy Case"). The Debtor continues to operate and manages its affairs as a debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner, and no committee has been appointed in the Bankruptcy Case.

2. The Debtor operates from the Facility, providing skilled nursing and medical care to elderly residents and residents with severe illnesses. The Facility has 204 skilled nursing beds, 81 of which are designated as sub-acute beds.

3. On or about April 1, 2006, the Debtor leased the real property at which the Facility is located (the "Sylmar Property") from El Sereno Manor, Inc. (the "Landlord"), and since then the Facility has been operating from that location.

4. Not unlike a number of health care facilities in the State of California, the Debtor's financial difficulties began in or about 2015, which, among other things, resulted in the Debtor falling significantly behind on its payroll taxes, the balance of which (including penalties and interest) currently exceeds four million dollars based upon the proof of claim filed by the IRS.

5. Unfortunately, the declining financial condition of the Facility was further exacerbated when on or about March 8, 2017, the Facility was cited by the California Department of Healthcare Services ("DHS") to correct various deficiencies. Although the Debtor was able to resolve these deficiencies, the Centers for Medicare and Medicaid Services ("CMS") designated the Facility as a special focus facility ("SFF Designation"), requiring certain improvements in its quality of care. Although the Facility has made significant improvements in the quality of care, and expects to be removed from the SFF Program within months, the SFF Designation has had a negative impact on the Debtor's participation in the state funded Medicaid program, as well as the federally funded Medicare program, which in turn, significantly reduced the Debtor's revenue.

6. As a result of, amongst other things, the SFF Designation, the increasing tax liabilities, and an above-market real property lease for the Sylmar Property, the Debtor had no choice but to enter into a comprehensive memorandum of understanding with Foothill on or about August 31, 2018 (the "Foothill MOU") pursuant to which the Debtor agreed to, amongst other things, appoint Foothill, as the manager of the Facility. Pursuant to the Foothill MOU and the related security agreement (the "Security Agreement"), Foothill asserts a security interest in most, if not all, of the Debtor's assets, including, without limitation, inventory, equipment, accounts receivables (including healthcare-insurance receivables), fixtures and general intangibles (collectively, the "Collateral"), which the Debtor disputes and has asserted certain defenses to.

7. As of August 31, 2018, Foothill assumed all operational and financial responsibility for the Facility.

8. Despite the MOU and the appointment of Foothill, the Debtor continued to face financial difficulties. Accordingly, the Debtor immediately consulted with insolvency counsel to explore and evaluate potential reorganizational strategies to preserve the Debtor's operations, including bankruptcy. After evaluating viable options, the Debtor determined that bankruptcy provided the best option for the Debtor, its patients, its creditors, and the community at large.

Since the Petition Date, the Debtor has begun to engage in good faith discussions and negotiations with a number of its larger creditors in order to continue to assess the most viable exit strategy. The Debtor has also endeavored to ensure substantial compliance with the guidelines and requirements of the Office of the United States Trustee (the "UST"). In addition, the Debtor has consented to the appointment of a patient care ombudsman (the "PCO") in order to provide an additional layer of transparency and comfort regarding the health and safety of the Facility residents, and the Debtor has already been involved in discussions with the PCO and his proposed counsel in order to ensure that this operational component is handled effectively and efficiently. Moreover, in order to provide yet (another) layer or transparency regarding the financial aspect of the Debtor's operations, the Debtor has been engaged in discussions with a number of potential candidates to serve as chief restructuring officer (the "CRO") for the Debtor, and has identified a qualified candidate who has not only significant bankruptcy experience, but significant health-care related bankruptcy experience. The Debtor intends to file a motion to seek authority to retain the CRO on or before December 31, 2018.

In the interim, and for the Interim Period, the Debtor seeks to use its cash in accordance with the budget (the "Budget") appended to the Declaration of Phil Weinberger (the "Weinberger Declaration") as Exhibit A, and incorporated herein by reference.

## III. DISCUSSION

### A. Section 363 of the Bankruptcy Code Authorizes a Debtor to Use Cash Collateral Either With (i) Consent or (ii) Court Approval.

Section 363(c)(2) of the Bankruptcy Code governs a debtor's use of cash collateral and provides, in pertinent part, as follows:

> (2) The trustee may not use, sell or lease cash collateral.... unless: ...[¶]... (A) each entity that has an interest in such cash collateral consents; or ...[¶]... (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363 (c)(2). Pursuant to § 1107(a), a debtor-in-possession has all the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in accordance with § 363. *See* 11 U.S.C. § 1107(a). As with most debtors whose primary assets are or may be subject to liens, the Debtor has an exigent and compelling need to use cash collateral. As noted in *Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)*:

> A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use "cash collateral" in its effort to rebuild. Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

727 F.2d 1017, 1019 (11th Cir. 1984) (internal citation omitted). (*upholding lower court's finding that, where a secured lender's collateral was worth less than the amount of the secured lender's claims, lender would nevertheless by adequately protected even if the debtor used gross profits obtained in the debtor's business operation so long as the debtor paid the secured lender the amount the lender would receive from the inventory in liquidation*).

Section 363(e) of the Bankruptcy Code provides, however, that upon the request of an entity that has an interest in property proposed to be used by the debtor, the court may prohibit or condition such use "as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363. In other words, the Court may authorize the Debtors' use of any cash collateral of any creditor upon determining that the interest thereof will be adequately protected if such use is authorized. *See In re McCombs Properties VI, Ltd.*, 88 B.R. 261 (Bankr. C.D. Cal. 1988).

Section 361 of the Bankruptcy Code identifies various methods for providing adequate protection. 11 U.S.C. § 361. The interest requiring adequate protection under § 363(e) is the value of the collateral subject to the secured creditor's security interest. *See United States v. Timbers of Inwood Forest*, 484 U.S. 362, 108 S.Ct 626 (1988). Such security interest is adequately protected, regardless of the method utilized, so long as the debtor's use of the collateral will not place the collateral at risk. *Id.*, 108 S.Ct at 633. In evaluating the sufficiency of adequate protection, courts must (1) establish the value of the secured creditor's interest in the

debtor's property, (2) identify the risk, if any, to the value of the secured creditor's cash collateral resulting from the debtor's use, and (3) determine whether the proposed adequate protection protects the value of the cash collateral as nearly as possible against risk to the diminution of that value. *McCombs, supra*, 86 B.R. at 267, *quoting In re Martin*, 761 F.2d 472 (8th Cir. 1985).

If there is a question as to whether any creditor which requires and/or requests adequate protection is adequately protected, the Court should find that the proposed adequate protection is sufficient in deference to the public policy favoring reorganization. *See Chrysler Credit Corp., supra*, 727 F.2d at 1019.

> Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor … are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of Cash Collateral shall be permitted during the early stages of administration.
>
> The first effort of the court must be to insure the value of the collateral will be preserved. Yet, prior to confirmation of a plan of reorganization, the test of that protection is not by the same measurements applied to the treatment of a secured creditor in a proposed plan. In order to encourage the Debtors' efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard.

*Mbank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397-98 (10th Cir. 1987) (internal citations omitted). In granting the debtor's motion to use cash collateral, the Court in *In re Heaton Inc.* further stated:

> At the beginning of the reorganization process, the Court must work with less evidence than might be desirable and should resolve issues in favor of the reorganization, where the evidence is conflicting.

6 B.R. 493, 496 (Bankr. W.D. Mo. 1980).

In the instant case, the purported cash collateral includes, *inter alia*, cash and deposits, inventory, and accounts receivables. Due to the nature of Debtor's business, the value of the Collateral depends on the continued operation of the Facility, which ensures that the Debtors continue generating accounts receivable and revenues necessary to maintain the business during the bankruptcy case. Thus, the greatest threat to the value of the cash collateral (and creditors' purported interest therein) is not its use; rather, it is the harm coincident with the cessation or reduction of the Debtors' operation, which is all but guaranteed if the Debtors are not permitted to

utilize cash collateral immediately. *See In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, (Bankr. D. Del. 1996)("*[I]f there is no actual diminution in the value of collateral through the date of the hearing, and the [Debtor] can operate profitably post-petition, [the secured creditor] is adequately protected for the use of its cash collateral.*"); *see also In re Wrecclesham Grange, Inc.*, 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997) ("as long as the debtor generates a continuous income stream, the debtors use of [cash collateral] does not diminish the value of the collateral."); *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 52, 56 (Bankr. N.D.N.Y. 1992) (finding a secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on the collateral); *In re Cardinal Indus., Inc.*, 118 B.R. 971, 981 (Bankr. S.D. Ohio 1990) (ruling that secured lenders were adequate protected by debtors' use of funds to maintain and manage the encumbered assets). Accordingly, the Debtors' continued operation of the Facility, in and of itself, constitutes adequate protection for the interest(s) of Foothill and the Employment Development Department (the "EDD") in the Collateral, if any.

**B. The Debtors Have Agreed in Principal with the IRS on Proposed Adequate Protection of Any Interest the IRS Has in the Debtor's Cash Collateral.**

The Debtor has engaged in good faith negotiations with the IRS over its claim against the Debtor and alleged security interest in the Debtor's Cash Collateral. The Debtor and the IRS have reached an agreement in principal regarding the use of cash collateral, including the remittance of monthly adequate protection payments in the amount of fifty thousand dollars and zero cents ($50,000.00) on a moving forward basis, which the Debtor and IRS are in the process of memorializing and expect to file with the Court prior to the hearing on this matter.

**C. Foothill Legacy and the California EDD Assert Liens on Cash Collateral, But Such Liens Are Disputed.**

Foothill has filed a UCC-1 Financing Statement, in which it asserts that it has a valid and enforceable security interest in all real and personal property of the Debtor. The California

Employment Development Department (the "EDD") has filed a number of liens on certain "real or personal property" of the Debtor and "rights to such property, including all after-acquired property and rights to property belonging" to the Debtor. However, given the anti-assignment provisions provided for in 42 CFR 424.80, the Debtor does not believe that either Foothill or the EDD has a valid or enforceable security interest in the Debtors' deposit accounts or the funds contained therein.

With respect to Foothill, the description of the purported collateral in the security agreement issued in favor thereof is not proof of a valid and enforceable security interest in the identified assets. To the contrary, a security agreement is merely that—an agreement to grant a security interest. To possess a security interest, the grantee of such an interest must perfect the interest in accordance with applicable law—here, the laws of the State of California. *See* D.E. 16, at pp. 29, 73. In this case, Foothill filed a Uniform Commercial Code ("UCC") Financing Statements (the "UCC-1s") in an effort to perfect a security interest in the collateral described in the security agreement, including but not limited to the accounts receivable of the Facility. Such a security interest, if any, however, is limited by applicable law.

Pursuant to section 552, the commencement of the Bankruptcy Cases terminated any interest any creditor might have in the accounts receivable generated by the operation of the Clinic following the Petition Date. More precisely, section 552 provides, in pertinent part:

> (a) Except as provided in subjection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case. (b)(1) … if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent

> provided by such security agreement and by applicable nonbankruptcy law ....

11 U.S.C. § 552. Thus, as a basic premise (and setting aside the imposition of any "replacement lien" and any collateral other than the Facility accounts receivable, Foothill only has a security interest in the pre-petition Facility AR and proceeds generated on account thereof (the "Proceeds")—not the accounts receivable generated by the operation of the Clinic following the Petition Date. Additionally, Foothill only has a security interest in the Proceeds to the extent permitted by applicable nonbankruptcy law, and Foothill has failed to establish that its security interest, if any, attaches to the Proceeds under applicable nonbankruptcy law. Indeed, as discuss *infra*, Foothill cannot, as a matter of law, establish a security interest in the Proceeds under applicable nonbankruptcy law.

The Proceeds consist of revenues from healthcare receivables or "health-care-insurance receivables." Unif. Comm. Code § 9-102(46) ("'[H]ealth-care-insurance receivable' means an interest in or claim under a policy of insurance which is a right to payment of a monetary obligation for health-care goods or services provided."). As a matter of state law, a lender can perfect their security interest in a healthcare receivable by filing a UCC financing statement and, if that security interest is properly perfected, any and all identifiable proceeds generated from or on account of these receivables will be automatically perfected.[1] *See* Cal. Comm. Code § 9-315(b)(3).

However, the specific facts and circumstances of this case, as well as the interplay of bankruptcy and public health and welfare law, mandate a different result. More specifically, both commercial and government payors deposit funds on account of the Facility AR (i.e., the Proceeds) directly into the Debtors' bank account. Pursuant to the order approving the maintenance of existing bank accounts and authorizing the continued use of cash management system, those funds will periodically be swept into an approved debtor-in-possession depository account. Under applicable nonbankruptcy law, once the funds are swept to, any security interest in the Proceeds which is or may be perfected by virtue of Cal. Comm. Code § 9315(b)(3) (automatic perfection) is extinguished by virtue of Cal. Comm. Code § 9332. *See* Cal. Comm. Code § 9332 ("(a) A transferee of money takes the money free of a security interest .... (b) A

---

[1] Under Cal. Comm. Code § 9315, a security interest in proceeds becomes unperfected on the 21st day after the attachment thereof unless certain conditions are satisfied. The Debtor does not address the limitation herein.

transferee of funds from a deposit account takes the funds free of a security interest in the deposit account….”); *see also In re Machinery, Inc.*, 342 B.R. 790, 795-96 (Bankr. E.D. Mo. 2006) (applying analogous Missouri law).

Moreover, 42 U.S.C. § 1396g(c) prohibits Foothill from exercising the control required under Cal. Comm. Code § 9314 to perfect a security interest in the underlying collateral absent a revocable standing Medicare/Medicaid deposit account service or control agreement (also known as a "double lockbox"), which was not in place here. More precisely, disbursements from Medicare and Medicaid are governed by certain anti-assignment statutes. The provisions prohibit the payment of any Medicare and Medicaid disbursements to anyone other than the provider or billing medical professional. *See* 42 U.S.C. §§ 1396g(c), 1396a(32). Additionally, the regulations governing the payment of Medicare and Medicaid disbursements strictly governs the role of banks and the ability of banks to assert any control over deposit accounts into which such funds are deposited. More precisely, section 3488.2 of the Centers for Medicare and Medicaid Services Intermediary Manual provides that the medical service provider must exercise exclusive control over any and all bank accounts into which Medicare and Medicaid funds are deposited. In order to account for the strict anti-assignment provisions, it is now common place for lenders t utilize "double lockboxes" to protect interests in Medicare and Medicaid receivables; however, Foothill did not do so here. As Foothill cannot assert a security interest in the Proceeds under applicable nonbankruptcy law, the Proceeds cannot constitute "cash collateral" as a matter of law

**E. The Debtor is Not Aware of Any Other Parties Asserting Valid Liens on Cash Collateral.**

Other than Foothill, the IRS and the EDD, the Debtor is not aware of any other entity that is asserting or could assert an interest in the Debtor's property, including its cash.

**F. The Court Should Authorize the Debtor's Use of Cash Collateral on an Interim Basis.**

The Debtor submits that the Court should authorize the Debtor's use of cash collateral on an interim basis pursuant to the terms of the Budget. Of the three entities who could claim or are claiming any interest in the Cash Collateral, the Debtor has negotiated an agreement in principal on adequate protection with one, and the Debtor believes in good faith that any liens claimed on the Debtors' Cash Collateral by Foothill or the EDD are invalid. Given the Debtor's urgent need

to use its cash to ensure the payment of, amongst other things, payroll on January 10, 2019, to pay medical supply vendors and its nursing and clinical medical staff, the Debtor respectfully requests that the Court approve the Debtor's use of Cash Collateral on the terms set forth herein and in the Budget.

## V. CONCLUSION

Based on the foregoing, the Debtor respectfully request that the Court enter an order (a) granting the Motion in its entirety; (b) authorizing the use of Cash Collateral, if any, on the terms set forth herein and in the Budget for the Interim Period; and (c) granting any further or additional relief the Court deems just and appropriate.

Dated: December 28, 2018

Respectfully submitted,

**FOLEY & LARDNER LLP**

By: */s/ Ashley M. McDow*
Ashley M. McDow
Fahim Farivar

[Proposed] Attorneys for Debtor and Debtor in Possession, PHILMAR CARE, LLC

**DECLARATION OF PHILIP R. WEINBERGER**

I, Philip R. Weinberger, hereby declare:

1. I am an individual over 18 years of age. I have personal knowledge of the facts stated herein as more fully set forth below or have gained such knowledge by review of the file and if called as a witness, I could and would competently testify thereto.

2. I make this declaration in support of the the Motion.[2]

3. I am one of the managing members for the Debtor, and, in that capacity, among other things maintain book, record, files and documents relating to the Debtor. In the ordinary course of business, I rely on the maintenance of true and correct copies of various documents relating to the Debtor. I have personally worked on books, records, files and documents, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from my business records, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of the Debtor's business at or near the time of the acts, conditions or events to which they related. Additionally, as the managing member, I have been involved in discussions and planning sessions related to the potential reorganization options and, thus, am familiar with the objectives the Debtor intends to achieve through the Bankruptcy Case.

4. I have read the content of the Motion, and to best of my knowledge, all the representations made in reference to my declaration are true and correct.

5. A true and correct copy of the budget in support of the Motion is attached hereto as Exhibit A, and incorporated herein and into the Motion by reference (the "Budget").

6. As set forth in the Motion, the Debtor seeks to use its cash in accordance with the Budget, which represents the expenses that are necessary and vital to the Facility's operation.

7. In the first fifteen (15) days of December 2018, the Facility received approximately $650,000.00 in revenues. The Debtor estimates to receive approximately the same amount in the first fifteen (15) days of January 2019.

---

[2] Capitalized terms otherwise not defined herein have the same meaning as in the underlying Motion.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ~~12th~~ 28 day of December, at Upland, California.

Philip R. Weinberger

# Exhibit A

## Philmar Inc., LLC

| | | Budget for 1/4/2019 - 1/15/2019 | FN |
|---|---|---|---|
| **Beginning Cash on Hand** | $ | 386,109.39 | |
| **Operating Income** | | | |
| Private Revenue Dollars | $ | 3,410.00 | |
| Medicare Revenue Dollars | $ | - | |
| Medicaid Revenue Dollars | $ | 74,185.33 | |
| Managed Medicaid Revenue Dollars | $ | 425,604.67 | |
| Comm Insur Revenue Dollars | $ | 47,388.67 | |
| Veterans Revenue Dollars | $ | - | |
| Other Revenue Dollars | $ | 9,729.00 | |
| ***Total Operating Income*** | $ | *560,317.67* | 1 |
| ***TOTAL CASH INFLOW*** | $ | **946,427.06** | |
| **Operating Expenses** | | | |
| Nursing Dollars | $ | 361,147.16 | |
| Food Related Dollars | $ | 15,844.50 | |
| Other Dietary Dollars | $ | 20,686.03 | |
| Laundry Dollars | $ | 13,053.00 | |
| Housekeeping Dollars | $ | 18,244.50 | |
| Maintenance Dollars | $ | 8,038.37 | |
| Utilities Dollars | $ | - | |
| Activities Dollars | $ | 6,408.33 | |
| Training Dollars | $ | 3,347.18 | |
| Resident Expenses | $ | 750.50 | |
| Medical Supplies | $ | 50,000.00 | |
| Other Minor Equip | $ | 500.00 | |
| Payroll Processing Fee | $ | 1,769.50 | |
| Storage Fees | $ | 214.50 | |
| Auto Expenses | $ | 522.75 | |
| Paid Mileage | $ | 536.25 | |
| Travel Expense | $ | 670.25 | |
| Bank Service Charges | $ | 536.25 | |
| Office Supplies | $ | 983.00 | |
| Copy/ Print- Printing | $ | 268.00 | |
| Postage | $ | 161.00 | |
| Insurance | $ | 80,000.00 | |
| Overnight Mail | $ | 134.00 | |
| Rent | $ | 147,334.40 | |
| ***Total Operating Expenses*** | $ | *731,149.46* | |
| **Ancillary Services Expenses** | | | 2 |
| Ancillary Gross Revenue Dollars | $ | 53,319.24 | |
| Direct Ancillary Expense Dollars | $ | 20,507.40 | |
| Contractual Adjustments Dollars | $ | (53,319.24) | 3 |
| ***Total Ancillary Services Expenses*** | $ | *20,507.40* | |
| **Restructuring Disbursements** | | | |
| Internal Revenue Services | $ | 50,000.00 | |
| ***Total Restructuring Disbursements*** | $ | *50,000.00* | |
| ***TOTAL CASH OUTFLOW*** | $ | **801,656.86** | |
| **NET INCOME** | $ | **144,770.20** | |

1. In the first fifteen (15) days of December 2018, the Facility received approximately $650,000.00 in revenues. The Debtor estimates to receive approximately the same amount in the first fifteen (15) days of January 2019.

2. Ancillary Services- support services other than room, board, and medical and nursing services that are provided to patients in the course of care. They include such services as laboratory, radiology, pharmacy, and physical therapy services

3. Contractual Adjustments - generally reduce the amount of the service charge, thus reducing the amount owed on the claim.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 555 S. Flower Street, Suite 3300, Los Angeles, CA 90071

A true and correct copy of the foregoing document entitled (*specify* **DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL ON AN INTERIM BASIS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF PHILIP WEINBERGER IN SUPPORT THEREOF**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) December 28, 2018, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Abram Feuerstein abram.s.feuerstein@usdoj.gov
- Everett L Green everett.l.green@usdoj.gov
- Ashley M McDow amcdow@foley.com, scvasquez@foley.com;Ffarivar@foley.com
- Roksana D. Moradi-Brovia roksana@rhmfirm.com, matt@rhmfirm.com;rosario@rhmfirm.com;janita@rhmfirm.com;jhayes@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com
- Benjamin Nachimson ben.nachimson@wnlawyers.com, ben.nachimson@wnlawyers.com
- Daniel H Reiss dhr@lnbyb.com, dhr@ecf.inforuptcy.com
- United States Trustee (RS) ustpregion16.rs.ecf@usdoj.gov

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) _______________, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) December 28, 2018, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Hon. Wayne Johnson
United States Bankruptcy Court
3420 Twelfth Street, Suite 384
Riverside, CA 925010-3819

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

-8694-1314.1

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| December 28, 2018 | Susan Vasquez | /s/ Susan Vasquez |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

3. **SERVED BY OVERNIGHT MAIL:**

**20 LARGEST UNSECURED CREDITORS:**

Advantage Tax Consultants, Inc.
8616 La Tijera Blvd., Suite 507
Los Angeles, CA 90045

Carefusion 203, Inc.
23578 Network Place
Chicago, IL 60673-1235

Continuing Care Risk Retention
716 College Ave, Suite B
Santa Rosa, CA 95404

Department of Healthcare Services
Acct Sec/Cashiers Unit, MS 1101
1501 Capital Ave., MS-1101
Sacramento, CA 95899

Department of the Treasury
Internal Revenue Services
Ogden, UT 84201-0030

F&W Food Services
P.O. Box 3140
North Hollywood, CA 91609

Franchise Tax Board
Bankruptcy Section MS A340
P.O. Box 2952
Sacramento, CA 95812-2952

Golden Compass Insurance Services
9327 Fairway View Pl.
Suite 106
Rancho Cucamonga, CA 91730

Gorelick & Uslander, CPA's
15260 Ventura Blvd.
Suite No. 1705
Sherman Oaks, CA 91403

Healthcare Services Group, Inc.
P.O. Box 829677
Philadelphia, PA 19182

Interface Rehab, Inc.
774 South Placentia Ave.
Suite 200
Placentia, CA 92870

Kaiser Foundation Health Plan
Attn: Legal Dept.
One Kaiser Plaza, 19th Floor
Oakland, CA 94612

LA Department of Water and Power
Attn: Legal Dept.
111 N. Hope Street
Los Angeles, CA 90012

Lewis Brisbois Bisgaard & Smith
633 West 5th Street
Suite No. 4000
Los Angeles, CA 90071

Medic-Air
2740 S. Harbor Blvd.
Suite H
Santa Ana, CA 92704

Renew Health Group
107 W. Lemon Avenue
Monrovia, CA 91016

Schraders Medical Supply, Inc.
5507 Brooks Street
Montclair, CA 91763

Star Pharmacy
14400 Vanowen Street
Van Nuys, CA 91405

Twinmed LLC
P.O. Box 847340
Los Angeles, CA 90054-0390

VIP Nephrology
16133 Ventura Blvd.
Suite 360
Encino, CA 91436

Employment Development Dept.
P.O. Box 826846
Sacramento, CA 94246

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012 **F 9013-3.1.PROOF.SERVICE**

-8694-1314.1

Main Document Page 18 of 18

**SECURED CREDITORS:**

Foothill Legacy, Inc.
5404 Whitsett Avenue, Suite 182
Valley Village, CA 91607

El Sereno Manor, Inc.
13347 Ventura Blvd.
Sherman Oaks, 91423-3912

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

:-8694-1314.1